# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANTWAIN PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24CV551 |
| | ) | |
| YATES, | ) | |
| in his official and individual capacities, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This case concerns a 42 U.S.C. § 1983 claim of excessive force brought by Antwain Porter, a pretrial detainee at all relevant times. (Docket Entry 2 at 2–4[1], Complaint.) The defendant is Sergeant Phillip Yates, a police officer for the City of Winston-Salem. (*Id.* at 2; Docket Entry 22-3 ¶ 2, Affidavit of Sergeant Phillip Yates.) The case is now before the Court on Porter's Motion for Discovery (Docket Entry 27) and Motion for Appointed Counsel (Docket Entry 28) as well as Yates's Motion for Summary Judgment (Docket Entry 21). For the reasons laid out in this opinion, the Court denies Porter's Motion for Discovery and denies Porter's Motion for Appointed Counsel without prejudice. The undersigned also recommends that the Court grant Yates's Motion for Summary Judgment.

---

[1] Unless otherwise noted, all citations herein refer to the page numbers at the bottom right-hand corner of the documents as they appear in the Court's CM/ECF system.

# I. BACKGROUND

Porter alleges that, on October 31, 2023,[2] at approximately 2:00 p.m., he

> was placed in a restraint chair from booking,[3] I was calm and didn't resist. I was slamed [*sic*] on the floor by Officer Yates while in cuffs, Then he twisted and broke my left shoulder while other officers where [*sic*] twisting my legs and other arm, all this happen after they transported me from booking to 4B floor of forsyth county detention center Jail, I was kneed and punched.

(Compl. at 4–5.) Porter further alleges that

> I was placed in a restraint chair after sitting calm for hours then transported to a Jail cell and slamed [*sic*] on the floor while cuffed then was punched and kneed officer yates and other officers then twisted my arms and legs, during this time officer yates broke my shoulder.

(*Id.* at 5.) Porter alleges that this took place in the "4th floor pode [*sic*] B" of the jail. (*Id.*) In the section of the form complaint asking what federal constitutional or statutory right the plaintiff is basing their Section 1983 claim on, Porter wrote: "Abuse, Excessive force, pain and suffering." (*Id.* at 3.)

As a result of the above use of force, Porter alleges he "injured [his] left big toe," "dislocated and broke" his left shoulder, and "sustained neck and back injuries." (*Id.* at 5.) Porter further alleges that he

---

[2] Porter originally alleged that these events took place on November 1, 2023. (*See* Compl. at 4.) However, Porter's attachment submitted in response to Yates's Motion for Summary Judgment states that he "was wrongfully attacked by defendant Yates on 10-31-2023" (Docket Entry 26-1 at 1) and that "I did correct myself on the wrong date originally filed" (*id.* at 3).

[3] According to Yates's brief in support of his motion for summary judgment, the booking area is a room where "arrestees are brought . . . to wait before appearing before a Magistrate, being fingerprinted and photographed (processed), and then being taken by Forsyth County Sheriff's Deputies into the jail portion . . . ." (Docket Entry 22 at 6 n.4.)

> [t]urned in multiple sick calls about injuries starting 1-07-2024 then another one on 1-28-2024, then filled out another one on 06-23-2024 along with other sick calls I didn't wright [*sic*] a paper [text crossed out] document for. But I never received any medical attention.

(*Id.*) Porter requests "$70,000 for pain and suffering and neglect." (*Id.*)

Yates denies that he injured Porter as described above. (Docket Entry 11 at 3.) Instead, Yates alleges that, on October 31, 2023, he arrested Porter in the public lobby of a magistrate's office. (Docket Entry 22-3 ¶¶ 8–9, Yates Affidavit.) Porter resisted being searched incident to the arrest, resulting in Yates and another officer pining Porter to a wall, forcing him to the ground, and kneeing him. (*See* Smith Video 2 at 00:09:45–00:12:05; Yates Video 2 at 00:02:08– End; Yates Aff. ¶¶ 11–14; Docket Entry 22-4 ¶¶ 9–14, Affidavit of Officer Joshua Terry; *see generally* Terry Video 3.) Officers then moved Porter from the lobby to the booking area of the jail. (Yates Aff. ¶ 14.) Then, after some time, other officers moved Porter to a restraint chair and transported him from the booking area to a jail cell. (*Id.* ¶ 20.) Yates alleges that he did not participate in transporting Porter from the booking area to the jail cell and "did not enter the jail, the fourth floor of the jail, or any cell occupied by Porter on that date or at any other time." (*Id.* ¶ 21; *see also* Docket Entry 22-5 ¶ 11 (Affidavit of Corporal David G. Smith stating that Yates "did not participate in, or assist the deputies in, transporting Porter from the booking room to the jail, and Sergeant Yates did not enter the jail with those deputies.").) Yates also submitted videos from the body cameras of four police officers: himself, Corporal Smith, Sergeant Mullins, and Officer Terry. These videos are summarized below.

## A. Body Camera Footage from Yates

Yates submitted three videos from his body camera. The first takes place outside Insight Human Services, a provider of substance abuse and mental health services. (*See* Yates Aff. ¶ 4; Docket Entry 22 at 3.) In relevant part, it depicts Yates getting out of his car to find two people yelling at each other, later identified as Porter and Christopher Smith ("Christopher") (Yates Aff. ¶ 5). (Yates Video 1 at 00:00:00–00:01:15.) Porter tells Yates that someone pulled a gun on him; Christopher tells Yates that Porter hit him with his bag. (*Id.* at 00:00:50–00:01:15.)

Christopher further explains to Yates that Porter was told not to stand in front of the building. (*Id.* at 00:04:00–00:04:20.) When Porter continued to stand there, Christopher told Porter that someone would call the cops on him if he did not move, which resulted in Porter becoming angry, yelling at Christopher, pushing on the door of the car Christopher was sitting in, and kicking the front of the car Christopher was sitting in as well as the passenger side mirror. (*Id.* at 00:04:20–00:05:32.) Christopher shows Yates the car in question; it has a dent on the front passenger side. (*Id.*) Christopher also tells Yates that when Christopher turned his back to Porter, Porter hit Christopher in the back of the head with a backpack, and that Christopher wants to go to the magistrate's office to press charges. (*Id.* at 00:05:50–00:06:20.)

Porter denies doing any of this and says that Christopher threatened him and another person pulled a gun. (*Id.* at 00:11:22– 00:12:20.)

Yates also with speaks with Calvin Ward, a man who works at Insight Human Services and purports to know what happened. (*Id.* at 00:14:40–00:17:15.) Ward tells Yates that a man had been yelling and making people uncomfortable, so Ward asked the man to leave. (*Id.* at

00:17:15–00:17:30.) The man then stood outside with his face up against the door, then against the window, and continued to come through the door and yell inside despite having been asked to leave. (*Id.* at 00:17:28–00:17:45.) Ward says that the man then kicked another man's bumper and mirror, after which that other man got out of the car; the first man then assaulted the second man with a bookbag and spit on him. (*Id.* at 00:17:45–00:18:04.) Ward indicates that the man from the car was Christopher by pointing at him and says that Christopher never did anything aggressive besides getting out of his car, and that the first man was the aggressor. (*Id.* at 00:18:04–00:18:35.)

Yates tells Porter that Christopher is about to go to the magistrate's office and Porter can do so as well if he wants to give his side of the story to the magistrate. (*Id.* at 00:21:50–00:23:10.) Yates tells Porter that the magistrate's office is located right beside the jail, and Porter walks away. (*Id.* at 00:23:10–00:23:30.) Yates and Christpher then confirm that they will meet at the magistrate's office. (*Id.* at 00:23:30–End.)

The second video from Yates's body camera takes place in the lobby of the magistrate's office. (*See* Yates Aff. ¶ 9.) Yates exits the lobby speaking with Christopher, the two shake hands, Christopher leaves, and Yates reenters the building. (Yates Video 2 at 00:00:00–00:00:30.) Yates tells Porter, who is sitting inside, that the magistrate has issued a warrant for his arrest, and that Porter should stand up, take off his backpack, and put his hands behind his back. (*Id.* at 00:00:30–00:00:49.) Porter complies and Yates handcuffs him, while Porter questions why he was not allowed to press charges given he was threatened and arrived first. (*Id.* at 00:00:50–00:01:30.)

Porter then says, "God, Ima kill that bitch," and Yates says, "Don't say that." (*Id.* at 00:01:30–00:01:36.) Porter says, "Ima kill that bitch. I can say whatever the fuck I want. Y'all can give me another charge. Ima kill Jasmine Gunter and my baby that's inside her. . . . Ima kill that bitch. I don't give a fuck. . . ." (*Id.* at 00:01:36–00:02:09.)

Yates tells Porter that he is going to undo Porter's jacket, which is currently zipped up to fully cover Porter, with the hood tightly secured over Porter's head, but as Yates reaches over Porter jerks away, saying, "Don't touch me." (*Id.* at 00:02:08–00:02:11.) Officer Terry— the only other person in the room—grabs Porter's back as Porter continues to jerk away, and Yates tells Porter he has to search him to make sure Porter does not have a weapon, and unzips Porter's jacket. (*Id.* at 00:02:11–00:02:20.) Yates again tells Porter that he is under arrest, to which Porter replies, "So what? Bruh stop touching me," and continues to jerk away. (*Id.* at 00:02:20–00:02:26.) Terry and Yates pin Porter, struggling, to the wall, and Yates says, "You're not gonna fight with us in here," to which Porter responds, "Well stop touching me then." (*Id.* at 00:02:26–00:02:29.) Terry can be heard telling Porter, "Stop," throughout. (*Id.*) Yates again tells Porter twice that he must search him and Porter, still struggling, responds, "'Chu mean? Fuck you touch me for bruh? I'm already in handcuffs, they can search me in there." (*Id.* at 00:02:26–00:02:35.)

Yates and Terry continue to attempt to search Porter, and he continues to struggle and yell, saying "Fuck outta my pockets," obscuring the camera at times, then breaking free from Yates as Terry yells, "Stop." (*Id.* at 00:02:35–00:03:11.) Yates regains a hold on Porter, who repeatedly yells, "They can search me in there," and attempts to break free again before Yates and Terry manage to get Porter to the ground, where they continue the search Porter over his

6

protests. (*Id.* at 00:03:11–End.) The video ends; Yates's affidavit indicates that the battery on his body worn camera died. (Yates Aff. ¶ 15.) Terry Video 3, summarized below, depicts the remainder of the struggle to search Porter.

The third video from Yates's body camera takes place in the booking area. (*See* Yates Aff. ¶ 15.) It begins as the camera is set down on a table across from Porter, who is seated with his hands behind his back. (Yates Video 3 at 00:00:00–00:00:30.) Porter yells and talks, complaining about the fact that he did not get a chance to tell his side of the story to the magistrate. (*Id.* at 00:30–00:07:10.)

Eventually, Corporal Smith enters the room, walks over to Porter, and asks Porter what happened. (*Id.* at 00:07:10–00:07:30.) Porter says that his life was threatened, and Smith responds, "That was part of the—over there on Fourth Street right? What happened down here?" (*Id.* at 00:07:30–07:43.) Porter responds that he came to press charges after being threatened with a gun but was not allowed to talk to the magistrate or give his side of the story. (*Id.* at 00:07:43–09:10.) Smith asks Porter if he is hurt, and Porter initially says he is, then says he is not "going to disclose that information, because I feel like anything that I say, I feel like y'all will try to keep me here, so I'll stay quiet and mind my business." (*Id.* at 00:09:10–00:10:00.) Smith asks Porter to confirm that he does not need an ambulance, and Porter says, "If I'm not going to jail, no." (*Id.* at 00:10:00–00:10:10.) Smith tells Porter that he does not know whether Porter is going to jail, but he needs to know whether Porter is injured, to which Porter responds that he is injured, "But you don't have to worry about it." (*Id.* at 00:10:10–10:20.) Smith calls for emergency medical services ("EMS"), and Porter says he will not let EMS see him, then continues to complain about other matters. (*Id.* at 00:10:20–00:11:25.)

7

Smith again asks Porter where he is injured, Porter again refuses to answer the question, and Smith walks off camera. (*Id.* at 00:11:25–00:12:30.)

Porter continues to talk, mostly unintelligibly and apparently to himself, for roughly the next twenty minutes, after which three people with a stretcher arrive. (*Id.* at 00:12:30–00:35:20.) Porter says, "I'm good. I'm hurt and all that but I don't want to be seen." (*Id.* at 00:35:15–00:35:22.) One of the individuals asks Porter what's going on, and Porter says he has scrapes on his elbow, pain in his shoulder, neck, and back from being kicked or kneed by Yates while in handcuffs, but that he does not want his vitals taken, then proceeds to accuse Yates of falsely telling him that he could give his side of the story if he came to the magistrate's office. (*Id.* at 00:35:22–00:38:10.)

Sergeant Mullins enters the frame and asks Porter what hurts. (*Id.* at 00:38:10–00:38:35.) Porter says he was kneed and kicked, and that he is hurt on his head, neck, and back, and has scrapes on his elbows; still, Porter tells Mullins that he does not want to be examined. (*Id.* at 00:38:35–00:39:40.) After Porter complains about a variety of unrelated matters for several minutes, Mullins walks away. (*Id.* at 00:39:40–00:43:35.)

Porter continues to talk and yell at random intervals. (*Id.* at 00:43:35–01:23:20.) At one point he starts yelling that he is "not going to comply" and if "y'all tell me to get down on the ground . . . I'm not going to do none of that. Y'all going to have to put me in a chair. Soon as y'all try to get me out, y'all gonna have to put me back in the chair. I'm not complying, none of that. . . I'm willing to die right now . . . I'm resisting to the max. . . . Y'all gonna have to tase me over and over again. Y'all gonna have to make my heart stop." (*Id.* at 01:06:00–01:09:00.)

8

Eventually, at least seven officers enter the room and surround Porter as he yells. (*Id.* at 01:23:20–01:23:40.) One officer asks Porter if he will walk with them, and Porter replies "No, I'm straight resisting and all that. . . . Y'all gonna have to tase me. Y'all say get out the room and all that, I'm not. Y'all put me in a chair, y'all gonna have to put me back in. . . ." (*Id.* at 01:23:40–01:24:30.) During this time, Yates appears to pick up the camera and attach it to his chest but to remain behind the table; he does not join the other officers surrounding Porter. (*Id.*) The officers wheel a chair into the room, then grab Porter on both sides and transfer him to the chair, strap him in, and wheel him out of the room. (*Id.* at 01:24:30–End.)

## B. Body Camera Footage from Smith

Yates submitted two body camera videos from Corporal Smith. In the first video, Smith enters the lobby of the magistrate's office, where multiple police officers including Yates and Terry are standing next to Porter, who is handcuffed. (Smith Video 1 at 00:00:00–00:02:25.) The struggle to search Porter, as depicted by Yates Video 2 and Terry Videos 2 and 3, has apparently just concluded. The officers pick up what appear to be Porter's belongings—a bookbag, wallet, etc.—from the floor as Porter complains that he was supposed to be pressing charges, warns the officers, "Don't start," and says he will "kill that bitch and her baby if y'all try to do this to me." (*Id.* at 00:02:25–00:04:34.)

As the officers escort Porter out, Terry remarks to Smith, "I don't know what he was charged with originally but he headbutted me in the face so I'm fuckin' charging if no one else does." (*Id.* at 00:04:35–00:04:40.) The officers walk outside, then Terry says: "I think he broke my nose." (*Id.* at 00:04:40–00:05:41.) The other officers look at Terry's nose and agree that it is broken, then discuss what Terry should do for treatment. (*Id.* at 00:05:41–End.)

9

The second video takes place in the booking area. Porter can be seen sitting handcuffed and Yates is sitting behind a table. (Smith Video 2 at 00:00:00–00:04:22.) The next few minutes of the video are duplicative of Yates Video 3 at 00:07:10–00:12:30. (*Id.* at 00:04:22–00:06:15.) Smith then walks into a different room and Yates follows him. (*Id.* at 00:06:15–00:06:30.)

Yates then proceeds to tell Smith about the events leading to Porter's arrest. (*Id.* at 00:06:20–00:09:45.) When describing the arrest, Yates says, "First he's cool, and then all of a sudden once we got handcuffs on him and started to search him—cause we don't know what he's got on him at this point . . . soon as we start trying to search him, he starts pulling away like if he might have something on him. I'm thinking does he have a gun, what does he have. We pin him to the corner of that wall right there. At one point I see him rear his head back . . . I'm calling for backup . . . and he hit Terry in the face. I guess that's how Terry got, at some point during the struggle I seen Terry has blood on his nose. At some point during the struggle my camera cut off 'cause I never got to go get a new one . . . . At one point I just mounted him. This was after he rolled over and was still pulling away from Terry, resistive behavior." (*Id.* at 00:09:45–00:10:40.) Smith asks, "Still standing up…?" and Yates responds, "No at one point . . . I think it was after he headbutted Terry, I was tired of getting, like, him swinging his head around and all that stuff so I brought him on down to the ground. Once I got him down to the ground, he was rolling over at one point, had his legs, still had to search him to figure out if he's got a weapon or anything. At one point I delivered a knee strike to the back of his major muscle mass here in the leg, just trying to get compliance. That just made him mad. At one point I ended up just . . . mounting him by putting my legs up on top of his legs and I sat

10

on top of him with his hands behind his back so that he could still breathe . . ." (*Id.* at 00:10:40–00:11:20.) Smith says, "So he was on his back?" (*Id.* at 00:11:19–00:11:21.) Yates says, "Correct, and we were just holding him down at that point, because we're trying to get people to come. . . ." (*Id.* at 00:11:21–00:12:05.)

Smith and Yates return to the booking area soon after, and the remainder of the video largely duplicates the content of Yates Video 3. (*See id.* at 00:12:05–01:17:40.) When a large group of officers surrounds Porter to escort him out, Yates can be seen standing behind a table and remaining there as other officers put Porter in the restraint chair and wheel him out of the room. (*Id.* at 01:17:30–End.)

### C. Body Camera Footage from Mullins

Yates submitted three videos from the body camera of Sergeant Mullins. The first, in relevant part, duplicates the events of Yates Video 3 at 00:38:10–00:43:35, in which Porter tells Mullins he is injured but refuses to let Mullins inspect him. (*See* Mullins Video 1 at 00:02:50–End.)

The second video, in relevant part, involves a conversation between Mullins and Yates in which Yates describes the events leading up to the arrest as well as the struggle to search Porter after the arrest. Yates largely provides the same information that he told Smith in Smith Video 2 at 00:09:45–00:12:05, but describes the struggle and knee strike he delivered to Porter in slightly more detail. (Mullins Video 2 at 00:00:35–End.) Specifically, Yates says "At one point, he was on his side, still pulling away. We didn't know if he had a gun, if he had a knife, what he had on him because he wouldn't let us search him. So as he's resisting I took my knee and delivered a knee strike to the major muscle mass, back of his leg, trying to strike the

11

peroneal. Don't know if I actually got to hit it because he was squirming all over the place trying to prevent Terry and me from holding on to him." (*Id.* at 00:05:10–00:05:35.) Mullins later asks if this happened after Porter headbutted Terry, and Yates confirms that the headbutt happened while they were still standing up, then Yates got Porter on the ground, "but he was still being resistive, so I did a knee strike to the major muscle mass of his leg to get his attention to stop pulling away so I could search him and make sure he didn't have a gun." (*Id.* at 00:07:50–00:08:15.)

The third video depicts Mullins walking in and out of the booking area, with Porter yelling throughout. (*See generally* Mullins Video 3.)

### D. Body Camera Footage from Terry

Yates submitted three videos from the body camera of Officer Terry. The first video aligns with the events depicted by Yates Video 1. (*See generally* Terry Video 1.) The second video aligns with Yates Video 2, showing Yates and Terry arrest Porter in the otherwise empty lobby of the magistrate's office, and a struggle ensue after Yates begins to try to search Porter. (*See generally* Terry Video 2.) The video ends as Yates and Terry pin Porter to the wall.

The third video appears to start where the second video left off, and includes the remainder of the struggle to search Porter past the point when Yates's body camera died. The video begins with Porter struggling and saying, "Fuck outta my pockets," while Yates and Terry hold him against the wall. (Terry Video 3 at 00:00:00–00:00:05.) Porter yells and rears toward Terry multiple times, obscuring the camera, as Terry yells, "Stop." (*Id.* at 00:00:05–00:00:30.) Terry and Yates force Porter to the ground, face down, and Yates can be seen

kneeling over Porter as Porter says, "Stop," and Yates says, "You have to be searched man…I'm trying to get you released." (*Id.* at 00:00:30–00:01:00.)

Terry and Yates start to search Porter again, and Porter responds to Yates, yelling "Fuck y'all not. Y'all trying to make me kill somebody. Y'all think I'm a bitch. Fuck no I'm not going [unintelligible] jail." (*Id.* at 00:01:00–00:01:20.) Terry starts to search Porter's waistband and Porter says, "Fuck. That ain't shit. Stop touching me. Fuck off me," then rears back. (*Id.* at 00:01:20–00:01:33.) Terry yells, "Stop," Yates's knee appears to contact the back of Porter's leg, and Porter yells "[Unintelligible] You got me fucked up. . . . . You gonna have to jail me. [Unintelligible] Knee me again. . . ." (*Id.* at 00:01:33–00:01:45.)

In the struggle, Porter appears to have been turned onto his back, Yates is now straddling Porter's legs or waist, and Terry is holding Porter down with one hand on Porter's chest and another on his head. (*Id.* at 00:01:45–00:01:50.) Porter continues to yell, saying things like: "If you don't get outta my face, I'm gonna make y'all hurt me." (*Id.* at 00:01:50–00:03:15.) Yates talks into his radio, giving his location and asking for "a couple units." (*Id.* at 00:03:15–00:03:30.) As Terry and Yates ask Porter to calm down, Yates remarks that his camera battery died. (*Id.* at 00:03:30–00:04:15.) Terry and Yates are finally able to search Porter's waistband; they then stand him back up, and the frame shows that several other officers have entered the room. (*Id.* at 00:04:15–00:05:00.) The video from this point on aligns with Smith Video 1.

13

## II.    MOTION TO COMPEL DISCOVERY

The undersigned understands Porter's Motion for Discovery (Docket Entry 27) to be a motion to compel discovery and denies it because it is untimely and does not certify that Porter first attempted to obtain discovery without court involvement.

Rule 37 allows a party to file a motion to compel after the opposing party refuses to turn over appropriate discovery. Fed. R. Civ. P. 37(a)(1). However, "[t]he motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." *Id*.; *see also* L.R. 37.1(a) ("The Court will not consider motions and objections relating to discovery unless moving counsel files a certificate that after personal consultation and diligent attempts to resolve differences the parties are unable to reach an accord.").

District courts generally have broad discretion in managing discovery, including whether to grant or deny a motion to compel. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995); *Erdmann v. Preferred Research, Inc. of Georgia*, 852 F.2d 788, 792 (4th Cir. 1988). Additionally, "[a] pro se litigant is entitled to some consideration of his non-lawyer status[.]" *Crisp v. Allied Interstate Collection Agency*, 149 F. Supp. 3d 589, 593 (M.D.N.C. 2016) (emphasis in original). However, "*pro se* litigants are not entitled to a general dispensation from the rules of procedure or court-imposed deadlines." *Dewitt v. Hutchins*, 309 F. Supp. 2d 743, 748–49 (M.D.N.C. 2004) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)); *see also Dish Network L.L.C. v. Jones*, No. 1:15CV874, 2016 WL 4491722, at *2 (M.D.N.C. Aug. 25, 2016). Without the ability to hold *pro se* litigants to such deadlines,

14

"effective judicial administration would be impossible." *Diamond v. Odedere*, No. 1:22CV287, 2024 WL 5705096, at \*4 (M.D.N.C. Oct. 25, 2024) (citation modified) (Auld, M.J.).

Here, the Court denies Porter's Motion for Discovery because it is untimely and does not certify that Porter first attempted to serve discovery requests on Yates despite the Court previously having instructed Porter to do so. On September 16, 2024, the Court placed these proceedings on "the Standard discovery track modified only to allow for a discovery completion date of March 17, 2025, to account for Plaintiff's status as a prisoner." (Docket Entry 12.) Porter filed a Motion for Discovery similar to the instant one on September 30, 2024. (Docket Entry 13.) The Court denied that motion without prejudice and instructed Porter to "properly serve Defendant with discovery requests such that Defendant may respond." (Text Order dated 01/03/2025.) Then, on May 21, 2025—two months after the close of discovery—Porter filed the instant motion, again without "includ[ing] a certification that [he had] in good faith conferred or attempted to confer with [Yates] to make disclosure or discovery in an effort to obtain it without court action." *See* Fed. R. Civ. P. 37(a)(1). Having already given Porter a second chance to obtain the discovery he sought while discovery remained open, the Court declines to give him a third chance now that discovery has closed.

For these reasons, the Court denies Porter's Motion for Discovery.

## III. MOTION TO APPOINT COUNSEL

The Court denies Porter's Motion for Appointed Counsel (Docket Entry 28) because there is no indication that this case falls into the exceptional category under which such an appointment is warranted. A litigant has no right to appointed counsel in a 42 U.S.C. § 1983 suit. *Alexander v. Parks*, 834 F. App'x 778, 782 (4th Cir. 2020). The Court may appoint counsel

15

in civil cases only when exceptional circumstances exist. *Cook v. Bounds,* 518 F.2d 779, 780 (4th Cir. 1975). The Court should ask "(1) whether the plaintiff has a colorable claim and (2) considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff lacks the capacity to present it." *Jenkins v. Woodard*, 109 F.4th 242, 247 (4th Cir. 2024) (quotation marks omitted). In *Jenkins*, for example, appointing counsel was appropriate because the plaintiff had both a colorable claim and "severe mental illness," including depression, bipolar disorder, and anxiety disorder, all of which required daily medication to treat. *Id.* at 244, 249.

Here, the Court finds no indication that this is an exceptional case warranting appointment of counsel. Porter does not appear to have the sort of colorable claim required to justify an appointment of counsel. *See infra*, Section V. And although Porter argues that he lacks the capacity to present his claim—stating that he has a "lack of professional training" and a "legal disability"—the record contains no additional information about Porter's disability. (*See* Docket Entry 28 at 1.) Moreover, Porter's claim is not complex: it involves a single defendant, stems from a single incident, and appears to involve only a single potential legal violation (excessive force in violation of the Fourth Amendment). (*See* Compl. at 2–5.)

Porter's Motion for Appointed Counsel (Docket Entry 28) is therefore denied without prejudice.

## IV.    PORTER'S SURREPLY

Before turning to Yates's summary judgment motion, the undersigned first considers a preliminary matter: whether to consider Porter's Surreply filed June 20, 2025 regarding Yates's Motion for Summary Judgment. (*See* Docket Entry 34.) "The Rules of Practice and

Procedure of the United States District Court for the Middle District of North Carolina only allow for the filing of a motion, a response to a motion, and a reply." *DiPaulo v. Potter*, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010) (citing Local Rules 7.3 & 56.1). "Generally, courts allow a party to file a surreply only when fairness dictates based on new arguments raised in the previous reply." *Id.* Otherwise, a court need not consider a surreply. *See, e.g., id.*

Here, while the arguments in Porter's Surreply are often difficult to understand, they do not include any argument that Yates's Reply advanced new arguments. (*See generally* Docket Entries 34.) The Surreply also appears to rehash arguments similar to those Porter advanced in his earlier Response to Yates's motion.[4] (*Compare* Docket Entry 26 *with* Docket Entry 34.) There is one exception: the Surreply responds to Yates's argument that the "affidavit" attached to Porter's Response is improper. (*See* Docket Entry 34 at 3–4.) Because Yates raised that

---

[4] First, the Surreply argues that Porter "did not get any police body camera footage disks." (Docket Entry 34 at 1.) If Porter means he did not get any video of him being escorted to his jail cell, this section duplicates his arguments from his Response. (*See* Docket Entry 26 at 1 ("There is video footage of me and defendant Yates, but not of the interactions in question.").) If Porter means that he received no video evidence at all, this section contradicts his Response. (*See id.*)

Second, the Surreply advances multiple arguments related to Porter's allegation that Yates came to Porter's jail cell and injured him. (*See* Docket Entry 34 at 1–3, 5–9.) Porter also presented these sorts of arguments in his Response. (*See* Docket Entry 26 at 1–2 ("Defendant Yates and his attorney failed to prove he was not inside my cell . . . .").) The Surreply spends more time on these arguments than Porter's initial Response did—for example, the Surreply includes assertions that Yates is "not competent" (*id.* at 2), that Yates "tampered with the evidence" (*id.* at 3), and that Yates's evidence is inadmissible (*id.* at 7)—but it ultimately offers no additional evidence to support Porter's claim.

Third, the Surreply argues that the Court should appoint counsel for Porter due to Porter's difficulties representing himself. (*See* Docket Entry 34 at 3–4.) Porter advanced similar arguments in both his Response (*see* Docket Entry 26 at 2–3) and his Motion for Appointed Counsel (*see* Docket Entry 28 at 1).

Fourth, and as discussed above, the Surreply responds to Yates's argument that Porter's attachment to his Response was not a proper affidavit. (*See* Docket Entry 34 at 4–5.)

17

argument for the first time in his Reply, the undersigned has considered Porter's Surreply on the question of whether Porter's attachment to his Response (Docket Entry 26-1) is a proper affidavit. The undersigned does not otherwise consider Porter's Surreply.

## V.     MOTION FOR SUMMARY JUDGMENT

The undersigned recommends the Court grant Yates's Motion for Summary Judgment because Porter has produced insufficient evidence to allow a reasonable jury to decide in his favor. Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997) (per curiam). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met their burden, the non-moving party must then affirmatively demonstrate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). There is no issue for trial unless there is sufficient evidence favoring the non-moving party such that a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995). The moving party can therefore bear their burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish their claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).

18

When ruling on a motion for summary judgment, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Anderson*, 477 U.S. at 253–55. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248–49.

Here, the Court should grant Yates's motion for summary judgment for three reasons: (1) no reasonable jury could find that Yates used excessive force[5] on Porter because the evidence is so one-sided, (2) Porter's official capacity claim against Yates cannot satisfy *Monell*, and (3) Porter's individual capacity claim against Yates cannot overcome qualified immunity. The undersigned addresses each of these reasons below.

## A. Excessive Force

Porter has not produced sufficient evidence to allow a reasonable jury to find that Yates used excessive force against him, whether in his jail cell or in the lobby of the magistrate's office. "[A]ll claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be

---

[5] Insofar as Porter intended to bring an additional claim of deliberate indifference to medical needs under the Fourteenth Amendment (*see* Compl. at 5 (alleging Porter "never received any medical attention" for his injuries)), Porter has also failed to create a genuine issue of material fact over that claim. For such a claim to succeed to succeed, a defendant must have "acted or failed to act" in some way regarding the plaintiff's medical care. *See Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024). But Porter never even alleges, much less evidences, that Yates—the only defendant in this case—was involved in Porter's alleged denial of medical care. (*See generally* Compl.; *see also* Docket Entries 26 and 26-1.)

analyzed under the Fourth Amendment and its 'reasonableness' standard." *Franklin v. City of Charlotte*, 64 F.4th 519, 530 (4th Cir. 2023). "Three factors, established by the Supreme Court in *Graham*, govern this analysis: (1) 'the severity of the crime'; (2) 'whether the suspect poses an immediate threat to the safety of the officers or others'; and (3) 'whether he is actively resisting arrest or attempting to evade arrest.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *accord. Martin v. Seabolt*, No. 1:21CV906, 2023 WL 3074718, at *10–*13 (M.D.N.C. Apr. 25, 2023), *adhered to on denial of reconsideration*, No. 1:21CV906, 2024 WL 1256067 (M.D.N.C. Mar. 25, 2024), *and aff'd sub nom. Martin v. Short*, No. 23-1588, 2024 WL 3200715 (4th Cir. June 27, 2024).

Here, the *Graham* factors are mostly irrelevant because Porter produced no evidence that Yates used force in the manner Porter describes, whereas Yates has produced evidence that he did not use such force. Porter attempted to file an affidavit saying Yates "wrongfully attacked" him when "escort[ing] me to my cell from the restraint chair I was siting in." (Docket Entry 26-1 at 1.) But an "unsworn declaration, certificate, verification, or statement" must be made "under penalty of perjury, and dated" for it to "have the same force and effect as an affidavit or other sworn statement." *Lumoa v. Potter*, 351 F. Supp. 2d 426, 430 (M.D.N.C. 2004) (quoting 28 U.S.C. § 1746). Porter's attempted affidavit was not submitted under penalty of perjury (*see* Docket Entry 26-1); it therefore constitutes only an unsupported allegation.

Yates, on the other hand, produced both his own affidavit and an affidavit from Corporal Smith, both stating that Yates did not escort Porter to his jail cell. (Yates Aff. ¶ 21; Docket Entry 22-5 ¶ 11.) While Yates has not produced any video of Porter being escorted

20

into his jail cell, Yates has produced videos of Porter being removed from the booking area in a restraint chair, presumably to be taken to his jail cell, and those videos do not depict Yates as being involved in that process. (*See* Yates Video 3 at 01:23:20–End; Smith Video 2 at 01:17:30–End.) Thus, the evidence in this case is so one-sided that, even when viewed in the light most favorable to Porter, it does not create a genuine issue of material fact over whether Yates was involved in transferring Porter from booking to a jail cell. It therefore also cannot create a genuine issue of material fact over whether Yates used excessive force while doing so.

Evidence does exist that Yates used force to search Porter after arresting him in the lobby of the magistrate's office. But Porter does not appear to intend that incident to form the basis of this suit. Porter's Complaint and his attempted affidavit both discuss only excessive force that occurred when Porter was transported from a restraint chair to a jail cell. (*See* Compl. at 4–5; Docket Entry 26-1 at 1.) Porter's Response also states that Yates provided "video footage of me and defendant Yates, but not of the interactions in question. Defendant Yates and his attorney failed to prove he was not inside my cell on the fourth floor . . . ." (Docket Entry 26 at 1.) Given that Yates did submit video evidence of Yates's forceful search of Porter in the lobby of the magistrate's office, Porter appears to be indicating that he is not suing Yates over that incident.

But even if Porter had intended to sue Yates over the incident in the lobby, there would still be no genuine issue of material fact over whether Yates used excessive force at that time. Again, Porter has produced no evidence regarding that incident. And the evidence produced by Yates—even when viewed in the light most favorable to Porter—shows that all three *Graham* factors weigh in favor of Yates's force being reasonable. Regarding the first *Graham*

21

factor—the severity of the crime—the crime for which Porter was arrested was assault, which raised the risk that Porter might become physically violent with the arresting officers. (*See* Yates Video 2 at 00:00:30–00:01:30; Yates Aff. ¶ 9.) Regarding the second *Graham* factor— whether the suspect poses an immediate threat—the force used by Yates was part of an attempt to search Porter to determine whether he posed an immediate threat. (*See* Yates Video 2 at 00:02:08–End; Yates Aff. ¶¶ 11–14; *see generally* Terry Video 3.) Regarding the third *Graham* factor—whether the suspect is actively resisting arrest—Porter was actively resisting by struggling and jerking away from Yates and Terry while they constantly yelled "Stop" and attempted to search him; as a result, Porter briefly escaped from Yates and fractured Terry's nose. (*See* Yates Video 2 at 00:02:08–End; Yates Aff. ¶¶ 11–14; Terry Aff. ¶ 12; Smith Video 1 at 00:05:41–End; *see generally* Terry Video 3.) For these reasons, it was objectively reasonable for Yates to pin Porter to a wall, force Porter to the ground, and knee Porter's leg (*see* Smith Video 2 at 00:09:45–00:12:05; Yates Video 2 at 00:02:08–End; Yates Aff. ¶¶ 11–14; *see generally* Terry Video 3) so that Yates could regain control and conduct a search.

## B. *Monell*

Yates argues that Porter's claim against him in his official capacity does not satisfy the requirements of *Monell v. Department of Social Services*. (*See* Docket Entry 22 at 19–21.) The undersigned agrees. *Monell* provides an additional reason why Porter's official capacity claim against Yates should be dismissed.

"[O]fficial capacity suits generally represent but another way of pleading an action against the entity of which the officer is an agent[.]" *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)); *accord. Robertson v.*

*Anderson Mill Elementary Sch.*, 989 F.3d 282, 287 n.5 (4th Cir. 2021).  If that entity is a municipality, *Monell* forbids courts from holding it liable for the independent acts of its employees under § 1983.  *See* 436 U.S. 658, 691 (1978).  A municipality is liable for its employees' acts only if it "follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights."  *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014).

Here, Porter has sued Yates, an employee of the City of Winston-Salem.  (*See* Yates Aff. ¶ 2.)  Porter's official capacity claims must therefore satisfy *Monell* by showing a custom, policy, or practice of rights violations in Winston-Salem.  But as previously explained, Porter has failed to produce sufficient evidence for even a single rights violation; he therefore cannot meet *Monell*'s more stringent requirement of showing a custom, policy, or practice of violations.  For this reason, Porter's claim against Yates in his official capacity should be dismissed.

### C.    Qualified Immunity

Yates asserts qualified immunity from Porter's claims against him in his individual capacity.  (*See* Docket Entry 17 at 5; Docket Entry 29 at 6–7.)  The undersigned agrees.  Qualified immunity provides an additional reason why Porter's individual capacity claim against Yates should be dismissed.

"The affirmative defense of qualified immunity protects law enforcement officers against lawsuits seeking money damages from them in their individual capacity."  *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 605 (E.D.N.C. 2009).  Deciding whether qualified immunity bars a claim requires a court to determine: "(1) whether the official violated a constitutional

right; and if so, (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 547 (4th Cir. 2010) (citation omitted).

As previously explained, Porter has not shown that Yates used excessive force against him. He therefore cannot meet the first element required to avoid qualified immunity.

## VI. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Porter's Motion for Discovery (Docket Entry 27) be **DENIED** and that Porter's Motion for Appointed Counsel (Docket Entry 28) be **DENIED** without prejudice. Furthermore, **IT IS HEREBY RECOMMENDED** that Yates's Motion for Summary Judgment (Docket Entry 21) be **GRANTED**.

/s/  Joe L. Webster
United States Magistrate Judge

December 16, 2025
Durham, North Carolina